## FLOWERS TRANSPORTATION INC.
### v.
## M/V PEANUT HOLLINGER, et al.

### Civ. A. No. 78–669.

United States District Court,
E. D. Louisiana.

June 20, 1980.

Frank J. Dantone and Ernest Lane, III, Greenville, Miss., for plaintiff, Flowers Transp., Inc.

John J. Broders, New Orleans, La., for defendant Adnac, Inc. d/b/a St. Charles Grain Elevator.

Timothy T. Roniger, New Orleans, La., for defendant Plimsoll Marine, Inc.

Terrence C. Forstall, New Orleans, La., and Randolph. Noble, Jr., Greenville, Miss., for defendant Eastbank Fleet, Inc.

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for non-jury trial on a former day. After careful consideration of the evidence adduced at trial, the memoranda of counsel, and the applicable law, and for the reasons hereinafter set out, the Court finds as follows.

To the extent that any of the following findings of fact constitute conclusions of

law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

This case arises out of the sinking of the barge RF–202 in the Mississippi River at the St. Charles Grain Elevator at approximately 12:30 A.M. on November 20, 1975. Plaintiff Flowers Transportation, Inc. is the owner of the RF–202. Defendant Adnac, Inc., d/b/a St. Charles Grain Elevator, is the operator of a grain terminal and dock located at Destrehan, Louisiana at Mile 120.6 on the Lower Mississippi River. Defendant Plimsoll Marine, Inc. is the owner and/or operator of the M/V SPANISH FORT which, pursuant to a contract with the grain elevator, operated as the operator's "fleet" or "shift" boat. Defendant Eastbank Fleet, Inc. is the operator of a barge fleeting facility located at approximately Mile 105 Lower Mississippi River, and was at all pertinent times owner and/or operator of the tug RUBY E.[1]

The barge RF–202 is an all-welded, steel constructed vessel of the covered hopper type. The vessel has a rake type bow and square stern. Its dimensions are 195′ long by 35′ wide by 11′ deep. The barge was built in 1959 by Avondale Shipyards, Inc. in New Orleans. It is a documented vessel of the United States official number 277979, with a net tonnage of 754 tons.

The RF–202 was emptied at Baton Rouge on October 13, 1975, and was towed by the M/V J. RUSSELL FLOWERS to St. Louis, arriving there on October 23, 1975. There were no notations in logs of any leakage problems with the RF–202 while it was in the tow of the M/V J. RUSSELL FLOWERS. The M/V THREE RIVERS LADY picked up the RF–202 in St. Louis and delivered it to Havana, Illinois on October 30, 1975. On November 5th, at Havana, the RF–202 was loaded with a cargo of 51,133.-21 bushels of No. 2 yellow corn. On No-

vember 7, the M/V PEANUT HOLLINGER picked up the barge at Havana. While in the tow of the M/V PEANUT HOLLINGER at approximately Mile 93 on the Illinois River, the RF–202 grounded, resulting in damage to its hull. The barge was pumped and shingled. On November 11, 1975, at Mile 178 Upper Mississippi River, the M/V PEANUT HOLLINGER exchanged tows with the M/V CITY OF ST. LOUIS. On November 12, the M/V CITY OF ST. LOUIS exchanged tows with the M/V TERESA SELEY. On November 15, the M/V TERESA SELEY and tow grounded at approximately Mile 612, Lower Mississippi River. The grounding was severe and several barges remained on the bar. However, the RF–202 floated downstream out of control along with some other barges from the tow of the TERESA SELEY. As a result of this incident the RF–202 sustained damage to its starboard rake and bottom hull damage, and in addition, the timber head on the port stern was torn away from its base.

On November 17, the TERESA SELEY delivered the RF–202 to Eastbank Fleet at approximately 4:00 A.M. Pursuant to a verbal agreement between Eastbank and Flowers Transportation, the barge was to be placed in the fleet at Eastbank and transported by Eastbank to the grain elevator for unloading for which services Eastbank was paid by Flowers.

After the barge's arrival, Eastbank Fleet personnel inspected the barge and found a 6″ by 1″ fracture in the deck weld on the starboard side, which was set in approximately five inches. In addition, another fracture was discovered which ran from the bow knuckle aft for approximately 10 feet, and was approximately 6 inches wide. It was also discovered that the barge had water in the bow up to the waterline and the number 1 wing tank had approximately 7 inches of water. The barge was pumped by Eastbank personnel following the inspection on the 17th of November. It was not

1. Plaintiff's claims against defendants Weathers Towing Co., Inc. and Nilo Barge Line, Inc. were compromised prior to trial.

pumped thereafter during the period it remained at Eastbank Fleet, but during this period the vessel remained on an even trim with ample freeboard all around.

Michael Quinn was employed by Flowers as barge coordinator in New Orleans. He maintained an office at the Eastbank facility. It was Quinn's responsibility to oversee the routine maintenance and repair of Flowers barges. Prior to the arrival of the RF-202 at Eastbank Fleet, Quinn had been advised by Flowers' Greenville, Mississippi office that the barge was damaged. Quinn was not at the fleeting facility when the barge was delivered there. He was advised by Al Treloar of Eastbank that it had a large gash in the starboard side but looked all right and dry. Quinn, however, was not aware that it had been pumped. Quinn, utilizing normal procedure, got an Eastbank fleet boat to take him through the fleet where he inspected the Flowers barges visually. He looked at the RF-202 but did not board it. He observed the barge to be trim with the gash above the waterline and no list. Based upon his observation Quinn determined that the barge could be safely unloaded prior to repair of the damage and so advised the fleeting facility. Quinn was aware that the barge would have to be shifted to the elevator for unloading but was not concerned as he felt that it would withstand normal towage to the elevator. Had Quinn determined that the barge could not be safely transferred to the elevator he had the authority to undertake other action such as temporary repair or unloading to another barge. Had he not indicated to Eastbank that the barge should be transferred for unloading, Eastbank would not have done so. Quinn gave Eastbank no special instructions regarding towage of the RF-202 as he believed that it was safe to tow in any normal manner.

The RF-202 remained in the Eastbank fleet until approximately 1:00 P.M. on November 19, 1975. At that time Eastbank's vessel, the RUBY E took it, along with the barges RF-106 and RF-222 to the St. Charles Grain Elevator some 15 miles upriver. The tow was made up with the RF-202 as the lead port barge with its starboard side adjacent to the port side of the RF-106 which was breasted up to the RF-222. The barges were towed with their bows facing upstream and the RUBY E faced up to the stern of the barge RF-106. The make-up of the tow was within the discretion of Neuman Toups, Jr., captain of the RUBY E, and he felt that it was safe to tow the damaged RF-202 in the fashion which he chose. Had he believed that there was danger of water getting into the gash on the RF-202 during the tow he would have made up the tow differently with the RUBY E faced up to the bow of the RF-202, the stern of the RF-202 faced up to one of the other barges and the third barge breasted up to the port side of the second. He did not utilize this method because he did not think that water entering the RF-202 during towage was a problem and for the reason that making up the tow in the aforementioned alternate manner or stringing out the tow would have resulted in increased towage time. Toups indicated that it was his practice to make up his tows in the manner in which the towage time was minimized as his employer was not paid on an hourly basis but by the trip. Making up the tow three abreast was the configuration which allowed the fastest towage in this case and it was the make-up chosen by Mr. Toups.

Mr. Toups proceeded at full speed between Eastbank and the elevator and the RUBY E and tow arrived at the St. Charles Grain Elevator at approximately 3:55 P.M. on November 19, 1975. The RUBY E contacted the SPANISH FORT and asked where to put its tow. The tow was tied at the No. 1 tier as a unit just as it had been pushed to the grain elevator, with the head of the tow facing upstream so that the RF-202 was the last barge on the tier, or the closest one to the middle of the river.

After tying off the tow the RUBY E left the elevator at 4:15 P.M. Neither the RUBY E nor anyone from Eastbank advised the elevator personnel or the SPANISH FORT that the RF-202 was damaged or leaking. Such actions were contrary to usual practice in such a situation as it was

customary for the boat or the fleeting facility to notify the elevator and/or the fleet boat on delivery of a "leaker." Possessing such knowledge, it was then the custom of the elevator to expedite unloading, or have the fleet boat watch out for the barge, or, if the delivering tug did not volunteer, to require it to stand by the leaking vessel. Absent such notification, elevator personnel and the crew of the fleet boat were not alerted to a potential problem by the mere fact that a given barge might appear out of trim as many barges arrived in that condition due to the nature of their loading.

At approximately 4:00 P.M., Captain St. Amant of the SPANISH FORT noted the RF–202 to be listing to the bow with about 6 inches of freeboard. However, he did not feel that this was unusual and attributed the fact to loading. At approximately 4:30 P.M. St. Charles barge foreman Joseph Barraco, working on the elevator's A leg, was advised by his co-worker Mr. Guillot, who was working at B leg, that the RF–202 was taking on water. Barraco called St. Charles barge traffic manager Cornell Nett to advise of the problem and advised Guillot to call the SPANISH FORT (which was docked approximately 200–300 feet from the RF–202) for assistance. Mr. Nett advised Eastbank's dispatcher that the barge was in trouble. The time of this call to Eastbank is not clear, but the Court is of the opinion that it followed shortly after Barraco's call to Nett shortly after 4:30 P.M. Although Eastbank's dispatcher's records do not reflect a call from Nett until 6:23 P.M., it is clear from the testimony of Arnitta Donnelly, (Eastbank's dispatcher from 6 P.M. to 6 A.M.) that the day shift dispatcher Maggie had been aware of the problem of the RF–202 prior to going off at 6:00 P.M., had tried to call Flowers' Mike Quinn without success, and advised Ms. Donnelly to keep trying.

Between 4:30 P.M. and 4:45 P.M. the elevator called the SPANISH FORT to go to the aid of the barge. The tug started its engines, a process which Captain St. Amant testified took approximately 30 seconds, and went to assess the situation. In St. Amant's opinion the barge had to be beached because it was "too far gone" for other measures and so advised the elevator.

The SPANISH FORT pushed the RF–202 straight ahead from where it had been moored in order to clear the elevator structure and then hard right into the bank which at that point is a rocky sloping area. Although the spot was rocky it was the most reasonable place for beaching the barge as the SPANISH FORT was unable to proceed upriver from the beaching point as it could not navigate under a bridge connecting the elevator "house" and dock. Downriver were tiers of empty barges from the St. Charles elevator and below them the Bunge grain elevator repair dock.

The SPANISH FORT attempted to push the RF–202 into the bank at a right angle, but the barge slipped off and the SPANISH FORT had insufficient horsepower to hold the barge to the bank. The barge was finally beached at an approximately 45 degree angle, bow headed upstream and the forward starboard corner aground. The SPANISH FORT stood by the beached barge leaving periodically when called by the elevator to shift barges.

At the time of the incident the grain elevator had no pumps located at its facility. There may have been a pump on board the SPANISH FORT which may or may not have been in working order, however, the crew on the SPANISH FORT did not undertake to pump the RF–202 as they did not feel such a course of action was indicated.

Michael Quinn was not at his office at Eastbank on the afternoon that the RF–202 was shifted to the elevator. He called his home about 6:30 P.M. that evening and found that Maggie from Eastbank was calling him. He called her at home about 7:00 P.M. and thereafter called Eastbank about 7:15 P.M. or 7:30 P.M. Eastbank advised him that the people at St. Charles thought that the RF–202 was sinking. Quinn, who was in downtown New Orleans at the time of the calls, went to his home and changed into work clothes. He then proceeded to the Eastbank facility, checked with the dis-

patcher, loaded pumps and gas on a truck and called Midas Mims Gage, a surveyor with Breit Marine, and requested that Gage meet him at the elevator. He then left Eastbank arriving at the elevator at approximately 10:00 P.M.

Prior to leaving home Mr. Gage called Mr. Wallace Lee, the operator of a barge repair service. Mr. Lee had a small work barge with salvage hitches and pumps which can be used to keep a barge afloat.

Mr. Quinn observed the RF-202 from the elevator dock on his arrival and noted that the starboard bow deck was just a little bit underwater and the port bow deck was awash. He called Flowers in Greenville and then waited for the arrival of Mr. Gage. Upon his arrival, at approximately 11:00 P.M., both men observed the vessel from the dock. Quinn again called Greenville. During the course of one of the calls to Greenville, Flowers in Greenville suggested that two Flowers barges which were at the elevator be shifted alongside the RF-202 to buoy it up. However, Quinn was advised by the elevator that the SPANISH FORT was too busy with elevator work to undertake the shifting operation suggested by Greenville. At about 11:30 P.M., Quinn and Gage requested that the SPANISH FORT take them out to the barge. The SPANISH FORT was made available without delay and took Quinn and Gage out to the barge. While they were discussing what they should do the RUBY E arrived back at the elevator, having been dispatched by Eastbank. The RUBY E arrived on the scene at approximately midnight. Wallace Lee arrived at approximately 12:15 A.M. on November 20. At approximately 12:30 A.M., on November 20, 1975, the RF-202 turned over and sank. It was subsequently raised and the cargo, to the extent possible, was salvaged. The barge was repaired at Southern Shipbuilding, Inc. in New Orleans and was out of service from the date of sinking until the completion of repairs on January 18, 1976.

The total damages sustained by plaintiff, including pre-judgment interest, is stipulated to be $215,000.00.

## FACTUAL CONCLUSIONS

The RF-202 was an old, but seaworthy barge when it began the voyage which ended with its sinking at the St. Charles Grain Elevator. During the course of its towage to New Orleans it sustained damages as a result of groundings which do not form part of plaintiff's claim in this lawsuit, such claims having been compromised prior to trial of this case. When the RF-202 arrived at the Eastbank fleeting facility it required pumping as the result of its damaged condition. Flowers' employee, Mr. Quinn, had been advised that the barge was damaged prior to arrival but was not present when it did arrive. He was advised by the Eastbank personnel that the barge had a gash in it but that it looked all right. He apparently was satisfied with this report. He did not inquire as to whether it had been pumped nor did he physically inspect the barge, choosing only to ride by it in the fleet boat. Seeing that it was trim and that the gash was above the water line, he determined that the barge could be unloaded prior to repair and that it would withstand normal towage to the elevator.

Obviously Quinn erred in his evaluation of the situation. His erroneous conclusion was due to his own negligent failure to properly inspect the barge. It is clear that, although the barge was trim after pumping, it was taking on water to some degree while moored at Eastbank as the result of damage that was not visible. Quinn had been advised that a damaged barge was arriving. His office was located at the fleeting facility and he had access to fleet boats to take him to the barge. However, he did not get onto the RF-202 to make his own inspection to determine if the barge was damaged to a further extent than that reported by Al Treloar of Eastbank and that visible to him as he passed by on the fleet boat. He did not inquire as to whether or not the barge had been pumped on arrival although such an inquiry would have been logical under the circumstances. Had Quinn boarded the barge during the approximately two day period that it re-

mained at Eastbank and checked for water the Court is confident that he would have noted water in the bow compartment and the wing tank and he would have determined that the barge was leaking from a source other than the visible gash. He could then have ordered further pumping prior to towage or revised his opinion that. the barge did not require some sort of repair prior to unloading or special handling during towage. In the Court's opinion any one of these actions could have prevented the sinking as it is clear from the rapidity with which the barge began to sink on arrival at the elevator that, although not listing to any great extent, the RF–202 when it left the Eastbank fleet contained an amount of water which was excessive in light of the bow damage and the probability that the barge would take on some water through the gash during normal towage. In light of this fact it either should have been pumped just prior to towage and/or special precautions should have been taken as to how it was to be towed or it should not have been transferred to the elevator prior to temporary repair. It was within the authority of Mr. Quinn to take any of the aforementioned steps. He had access to the barge and knew it had been in accidents prior to delivery to Eastbank. His failure to adequately determine the barge's condition resulted in a mistaken impression as to the true condition of the barge and appropriate treatment of it. We hold that this was negligent and a contributing factor to the sinking.

■ We hold that Eastbank Fleet was negligent by virtue of the fact that its employee, Captain Toups, although aware of the damage to the RF–202, chose to make up the tow in the most expeditious manner rather than the one which was the safest or most prudent when towing a barge damaged as the RF–202 was. Clearly, as the result of the make-up of the tow, the barge took on considerable water on the trip to the St. Charles elevator. Toups was further negligent in failing to notify the elevator that the barge was damaged and/or leaking. The RF–202 was noted by the elevator personnel to be taking on

water at 4:30 P.M., only approximately 15 minutes after the RUBY E departed the elevator and some 35 minutes after its arrival at the elevator. It is inconceivable to the Court that the barge did not display a noticeable change in its freeboard from the time that it left the Eastbank facility and such a change should have alerted the personnel of the RUBY E to the fact that the barge had taken on water during the tow. Knowing that fact, the delivering tug should have put the elevator on notice of the problem and either obtained its assurance that the barge would be specially cared for or stood by to render such service itself. It is the Court's opinion that the RUBY E delivered a barge which was in an almost sinking condition upon its arrival at the elevator, that such condition should have been obvious to the Eastbank employees on board the RUBY E and was in part created by their method of towage, and that, in spite of this, the RUBY E merely dropped off the barge and left. Such actions constituted negligence which was a contributing cause of the sinking.

■ The employees of St. Charles promptly noted the condition of the RF–202 and sent the SPANISH FORT to its aid without delay. The condition of the barge at that point was such that the decision of Captain St. Amant to beach the barge was utterly reasonable. At that point the deck of the barge was awash or nearly so. The SPANISH FORT's pump, even if operable, would not have been of any use under such conditions. Similarly it is insignificant that the elevator had no pumps. Neither the elevator personnel nor the crew of the SPANISH FORT can be charged with the requirement of possessing expertise in or the duty of performing sophisticated salvage techniques. In light of the physical conditions present including the configuration of the elevator structure and the location of adjacent facilities, the place chosen by St. Amant to beach the RF–202 was logical and reasonable. The fact that the SPANISH FORT was unable to keep the barge on the bank resulted from a lack of power. Had the RUBY E stood by, we

believe that the barge could have been beached. The evidence supports the conclusion that the SPANISH FORT stood by when it was not shifting barges. We do not feel that there was any duty upon the elevator to cease its operation to allow the SPANISH FORT to stand by the RF–202 constantly, nor do we find that the occasional leaving of the barge by the fleet boat contributed to the ultimate result. Similarly, we do not feel that the elevator was required to stop its operations while its fleet boat moved barges to buoy up the RF–202. There is no evidence that, in light of the condition of the RF–202 at that time, such a maneuver would have been effective and in fact it was suggested by a person who was not even present at the scene. Again had the RUBY E stood by, if such an operation had been feasible it could have been attempted.

The elevator promptly notified Eastbank of the condition of the RF–202. Eastbank promptly attempted to get in touch with Mr. Quinn without success. It was not until much later that Quinn was reached and still later when he actually began to take any action to save the barge. In the Court's opinion the delay contributed to the ultimate condition of the RF–202. Flowers should have had some back-up means of acting with regard to its barges when Quinn was not working. When Eastbank personnel realized that they could not get Quinn promptly they should have taken steps to either aid the barge themselves or to at least get in touch with Flowers' personnel in Greenville to obtain guidance. Had there not been so much delay in taking action, Mr. Wallace Lee and his salvage equipment could probably have reached the barge in time to perform corrective action.

When Mr. Quinn and Mr. Gage finally arrived at the elevator they were transported to the sinking barge by the SPANISH FORT as soon as they requested to be taken there.

## CONCLUSIONS OF LAW

The negligence of the plaintiff, Flowers, contributed to the sinking of the RF–202 in the proportion of 65%. The negligence of defendant Eastbank contributed 35%. There was no negligence on the part of the elevator or the SPANISH FORT. Accordingly, plaintiff is entitled to recover 35% of the stipulated damage (including prejudgment interest) of $215,000 from defendant Eastbank. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

The Clerk of Court is instructed to enter judgment in accordance with this opinion in favor of Flowers Transportation, Inc., and against Eastbank Fleet, Inc. in the sum of $75,250.00. Judgment shall further issue in favor of Adnac, Inc. d/b/a St. Charles Grain Elevator and Plimsoll Marine Inc., against Flowers Transportation, Inc., dismissing the claims of Flowers Transportation as against said parties with prejudice. Judgment shall further issue dismissing all cross-claims with prejudice and providing that costs of this proceeding shall be borne by Flowers Transportation, Inc. and Eastbank Fleet, Inc. in proportion to their respective fault.